RENFIELD CORPORATION and Renfield Importers, Ltd., Plaintiffs,

v.

E. REMY MARTIN & CO., S.A., Remy Martin Amerique, Inc., Glenmore Distilleries Company, and Foreign Vintages, Inc., Defendants.

Civ. A. No. 80–197.

United States District Court,
D. Delaware.

Dec. 13, 1982.

William J. Wier, Jr., Bader, Dorsey & Kreshtool, Wilmington, Del., Jerome A. Hochberg, David B. Hopkins, Paul H. Friedman, Laura Metcoff Klaus and Ann K. Sullivan of Arter, Hadden & Hemmendinger, Washington, D.C., for plaintiffs.

R. Franklin Balotti, Richards, Layton & Finger, Wilmington, Del., Wendy L. Addiss, Sullivan & Cromwell, Spengler, Carlson, Gubar, Brodsky & Rosenthal, New York City, for defendants E. Remy Martin & Co., S.A., and Remy Martin Amerique, Inc.

Bruce M. Stargatt, David C. McBride, Young, Conaway, Stargatt & Taylor, Wil-

mington, Del., Elliot S. Kaplan, James L. Harlow, Rita A. McConnell, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for defendants Glenmore Distilleries Co. and Foreign Vintages, Inc.

## MEMORANDUM OPINION

STAPLETON, District Judge:

This is an antitrust action brought by plaintiffs Renfield Corporation and Renfield Importers ("Renfield") against E. Remy Martin & Co., /S.A. ("Remy S.A."), Remy Martin Amerique, Inc. ("Remy Amerique"), and other defendants. Renfield has moved under Fed.R.Civ.P. 37(a)(2) for an order compelling production of certain documents withheld by the Remy defendants on the ground of attorney-client privilege. In the alternative, Renfield seeks an *in camera* inspection of these documents by the Court to determine on a document-by-document basis whether they are protected by the attorney-client privilege.

## I. AVAILABILITY OF THE ATTORNEY–CLIENT PRIVILEGE.

The communications at issue are 119 documents that reflect communications between officials of both Remy defendants and employees of Remy S.A. identified as its French "in-house counsel." [1] Renfield challenges Remy's assertion of the attorney-client privilege on the basis that the privilege does not apply to communications with French "in-house counsel." I shall consider separately the documents located in the offices of Remy S.A. in France and those located in the New York offices of Remy Amerique.

**1.** There are four individuals so identified: Guillaume d'Avont, Thibaud de Chasteigner, Pierre de Viel-Castel, and Alain Raab.

**2.** Article 11 goes on to indicate that a signatory of the Convention may elect to afford the witness the benefit of the privileges of other jurisdictions, such as the privilege recognized by the witness's domicile.

**3.** Question 10 reads:

## A. DOCUMENTS LOCATED IN THE OFFICES OF REMY S.A. IN FRANCE.

The parties are not in disagreement that the Hague Evidence Convention governs discovery of any of the documents located in France; they are in disagreement, however, as to the meaning of the relevant provisions of that Convention.

Two provisions are pertinent. Article 21(e) provides that:

A person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11.

Article 11, in turn, provides that:

The person concerned may refuse to give evidence insofar as he has a privilege or duty to refuse to give the evidence—(a) under the law of the State of execution; or (b) under the law of the State of origin...."

Defendants read these provisions to assure that a witness will have the benefit not only of privileges recognized by the forum State, but also privileges recognized by the State where the letters are executed.[2]

▇ Renfield reads them to permit a witness to assert only a privilege of the State of origin or State of execution which is otherwise applicable under conflict of laws principles. While there is room for argument, I find Renfield's reading of the language employed less plausible than that of defendants'. Moreover, I believe defendant's interpretation is more compatible with the limited "legislative history" of the Convention currently available to me. Both the United States and France in their answers to Question 10 of the "Questionnaire on the Taking of Evidence Abroad" [3] made in

What privileges are available to witnesses appearing under a letter rogatory—
a   only those of the law of the requested State?
b   only those of the law of the requesting State?
c   each privilege decreed either by the law of the requested State or by that of the requesting State?
d   only those decreed by both legislations cumulatively?

preparation for the Hague Convention evinced their intent that the treaty be a privilege creating, rather than privilege limiting, law.[4] Thus, I conclude that if a privilege is recognized by either French or United States law, the defendants may invoke it.

■ For the purpose of this motion, I assume that French law would not grant a privilege to refuse to disclose these documents. Therefore, I must consider whether United States law provides such a privilege. I conclude that it does. Preliminarily, it is clear that the communications were intended and reasonably expected to be confidential.[5] Thus, the only issue of any substance is whether the privilege is available where the attorney is a French "in-house counsel." Plaintiffs have urged that because French "in-house counsel" are not members of a bar, the privilege is unavailable. In order to decide this, it is necessary to have some understanding of the structure of the French legal profession.

The organization of the French legal profession is unlike that in the United States. In France, there are several categories within the practicing legal profession and each category performs a different function that, in the United States, would all be performed by an American lawyer (Affid. of Cournot ¶ 5, Appendix D to p.b.). For example, the "avocat" provides legal advice to clients and appears in court but may not be employed by any person or organization. The "conseil juridique" is allowed to pro-vide legal advice but may not appear in court and may only be employed by, or associated with, other "conseils juridiques." (Cournot ¶¶ 6, 7; Affid. of Goldman ¶¶ 35, 39, Appendix E to d.b.). Thus, an individual who is employed by a corporation is not permitted by law to be on the list of "avocats" or "conseils juridiques." Nevertheless, these individuals are not prohibited from giving legal advice.

Because there is no clear French equivalent to the American "bar," in this context membership in a "bar" cannot be the relevant criterion for whether the attorney-client privilege is available. Rather, the requirement is a functional one of whether the individual is competent to render legal advice and is permitted by law to do so. French "in-house counsel" certainly meet this test; like their American counterparts, they have legal training and are employed to give legal advice to corporate officials on matters of legal significance to the corporation.[6]

## B. DOCUMENTS IN THE NEW YORK OFFICE OF REMY AMERIQUE.

■ The Hague Evidence Convention is not applicable to documents located in the United States. Therefore, I must apply choice-of-law principles to determine whether United States or French privilege law applies.

There is no dispute that the choice-of-law standard is that the applicable law is that

---

**4.** Under Renfield's reading, the only effect of this provision of Article 11 is to limit the privileges otherwise available to the witness, i.e. to restrict otherwise applicable privileges to those recognized by the State of execution and the State of origin, excluding, for example, otherwise applicable privileges recognized by the law of the witness's domicile, absent a special undertaking from the State of origin.

**5.** The communicators did not expect the recipients to share the information other than perhaps with outside counsel. Renfield erroneously equates the issue of whether the communications were reasonably expected to be confidential with the issue of whether they are protected by an attorney-client privilege under the law which would be applicable under conventional conflict of law principles. To equate those issues in this context would be to defeat what I believe to be the intent of the Hague Evidence Convention—that a witness shall not be limited to the attorney-client privilege law of the jurisdiction whose laws would be applicable under such conflicts rules.

**6.** In a related argument, Renfield asserts that, as a matter of law, the communications cannot be treated as ones seeking legal advice where the lawyers are French and, therefore, presumptively unqualified to render advice on United States law. I disagree. While the fact that a lawyer is not a member of the bar of a United States jurisdiction may be relevant in determining whether a communication is for the purpose of securing legal advice, it is not necessarily determinative of that issue.

of the state with the most significant relationship with the communications. *Restatement (Second) of Conflict of Laws* § 139(1) (1971). In this case, the United States has the most significant relationship with the communications. The officials located in the New York office of Remy Amerique are the ones who have sought the legal advice and the United States has the same interest in protecting the freedom of these individuals to obtain legal advice as it does for any other American residents. For the same reasons stated above in connection with the Remy S.A. documents, the United States privilege law does recognize the Remy Amerique communications as privileged. It follows, therefore, that the attorney-client privilege is also appropriately applied to communications of Remy Amerique officials with French "in-house counsel."

## II. IN CAMERA INSPECTION.

As Renfield acknowledges, a party has no right to an *in camera* inspection of documents where his or her opponent files an affidavit setting forth facts sufficient to justify a claim of privilege and there is no record basis for questioning the veracity of the affidavit. I find no reason to question the representations of the defendants in this case. Renfield has had the opportunity to take discovery concerning the defendants' claims of privilege and has come up with nothing more than a single incident of misclassification which would appear to be the result of inadvertence. While the fact of foreign lawyers being consulted on United States law might, in some factual context, raise an issue of whether the communications were for the purpose of seeking legal, as contrasted with business advice, the background of the attorneys involved in these communications is such that their nationality raises no question in my mind about the defendants' representation.