**INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., et al., Plaintiffs,**

v.

**Walter LEE, Superintendent of The Port Authority Police, individually and in his official capacity, et al., Defendants.**

**No. 75 Civ. 5388 (MJL).**

United States District Court, S.D. New York.

Sept. 11, 1984.

---

David Grosz, Fisher & Moest, Los Angeles, Cal., Eugene N. Harlay, Levy, Gutman, Goldberg & Kaplan, New York City, David M. Liberman, Culver City, Cal., for plaintiffs.

Patrick J. Falvey, P.A. Mauer, Arthur P. Berg, Port Authority of New York and New Jersey, New York City, for defendant Walter Lee.

William H. Boice, Kilpatrick & Cody, Atlanta, Ga., for Air Canada group of defendants.

Philip Le B. Douglas, Edward F. Westfield, Hale, Russell & Gray, New York City, for Air India group of defendants.

Allen Rubeo, Alan D'Ambrosio, P.C., New York City, for defendant Lufthansa.

MICHAEL H. DOLINGER, United States Magistrate:

A. *Introduction*

Plaintiffs in this venerable lawsuit challenge the policy of the Port Authority and numerous domestic and foreign airlines that prohibits them from engaging in leafletting and other First Amendment activities in the public areas of the terminals at Newark, La Guardia, and J.F.K. International Airports. Following a remand earlier this year by the United States Court of Appeals for the Second Circuit, *see International Society for Krishna Consciousness, Inc. v. Air Canada*, 727 F.2d 253 (2d Cir.1984), this matter was referred to me by the Honorable Mary Johnson Lowe, United States District Judge, for all pre-trial purposes.

After the referral by the District Court, a pre-trial conference was held on May 24, 1984, at which time an expedited discovery schedule was established, in deference to the instruction of the Court of Appeals "to give the case high priority in view of the lapse of time." 727 F.2d at 257 n. 2. That discovery has apparently been proceeding apace,[1] but one of the defendants, Lufthansa German Airlines ("Lufthansa") has now raised, for the first time, a procedural defense to the plaintiffs' request for production of documents and, by implication, to all other discovery requests in this case to be addressed to Lufthansa.

Specifically, Lufthansa claims that, inasmuch as it is "a corporation organized and existing under the law of the Federal Republic of Germany," all discovery requests to it must comply with the Hague Convention on the Taking of Evidence Abroad in

Civil or Commercial Matters, 28 U.S.C.A. § 1781 note (Supp.1984). *See* Affidavit of Alan A. D'Ambrosio, Esq. sworn to July 3, 1984 at ¶ 3. According to Lufthansa, the Convention requires, *inter alia*, that discovery requests be in the form of a Letter of Request from the "judicial authority of a Contracting State" to "the competent authority [sic]" of the state whose national is the subject of the discovery request, D'Ambrosio Affidavit at ¶ 4 (quoting the Hague Evidence Convention, Ch. 1, Art. 1), that the letter specify all items of information sought and that it "be issued in the language of the authority requested to execute it, or be accompanied by a translation in that language." D'Ambrosio Affidavit at ¶ 4.

In substance Lufthansa contends that, by virtue of the Hague Convention, discovery against a party defendant may not proceed under the ordinary federal rules of discovery if the defendant is a foreign national. This prohibition, it asserts, applies regardless of whether the information sought to be discovered is available in the United States or must be obtained from a foreign country.

For the reasons that follow, Lufthansa's motion for a protective order is denied. The Hague Convention does not affect discovery of information in the United States. With respect to information available only from foreign countries, its application is discretionary with the Court, and in the circumstances of this case resort to the Convention for document and interrogatory discovery should not be required.[2]

B. *The Hague Convention*

By common law and statute, the United States has long provided a variety of means for the pre-trial discovery of infor-

---

**1.** In deference to the representation by eight of the foreign air carrier defendants that they have reached a settlement in principle with plaintiffs, discovery as to them has been stayed by consent until September 15, 1984. *See* Order dated August 27, 1984.

**2.** I do not address the question of depositions abroad since it is not clear that plaintiff will

ever seek such discovery. *See Volkwagenwerk A.G. v. Falzon*, — U.S. —, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984) (dismissing, for lack of jurisdiction, appeal from state court order permitting plaintiff in state court action to depose German corporate defendant's employees in Germany).

mation from other countries. As reflected, for example, in Fed.R.Civ.P. 28(b), which concerns specifically the taking of depositions, these have included depositions "on notice before a person authorized to administer oaths in the place in which the examination is held, either by the law thereof or by the law of the United States ...", depositions "before a person commissioned by the court", and depositions pursuant to a letter rogatory.[3]

█ In addition, in those cases in which a foreign corporation or individual is a party to a lawsuit in a United States federal court, the courts have repeatedly recognized that they have the authority to compel the party to provide all necessary discovery. This authority is an incident of the court's jurisdiction over the foreign party, and extends to the requirement that the party provide discovery information obtainable only from its native country. Moreover, this authority to compel disclosure by a party from a foreign country—in either civil or criminal proceedings—is undiminished even in those cases in which the disclosure of such information may violate the laws of the foreign country or subject the disclosing party to civil penalties. *See, e.g., Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 204–06, 78 S.Ct. 1087, 1091–1093, 2 L.Ed.2d 1255 (1958); In re *Grand Jury Proceedings,* 740 F.2d 817, 831–33, (11th Cir.1984); *United States v. Vetco, Inc.,* 691 F.2d 1281, 1286–91 (9th Cir.1981); *State of Ohio v. Arthur Anderson & Co.,* 570 F.2d 1370, 1373 (10th

Cir.), *cert. denied,* 439 U.S. 833 (1978), 99 S.Ct. 114, 58 L.Ed.2d 129; *In re Westinghouse Elect. Corp. Uranium Contracts Litigation,* 563 F.2d 992, 997 (10th Cir. 1977); *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338, 341–42 (10th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *In re Grand Jury Proceedings,* 532 F.2d 404, 407 (5th Cir. 1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *United States v. First National City Bank,* 396 F.2d 897, 900–01 (2d Cir.1968); *SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 114–17 (S.D.N.Y.1981); In re *Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1144–45 (N.D.Ill.1979); *American Industrial Contracting, Inc. v. Johns-Manville Corp.,* 326 F.Supp. 879, 880 (W.D.Pa.1971).[4] *See generally* Olsen, "Discovery in Federal Criminal Investigations", 16 N.Y.U.J. Int'l L. & Pol. 999, 1012–26 (1984); Radvan, "The Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters: Several Notes Concerning its Scope, Methods and Compulsion", 16 N.Y.U.J. Int'l L. & Pol. 1031, 1053 & n. 111 (1984).

Despite the potential availability of these procedures for obtaining foreign discovery, litigants encountered difficulties in practice when such discovery depended upon the cooperation of foreign governments and legal systems. Unlike the common law countries, the civil and Islamic legal systems do not have equivalent procedures for pre-trial discovery, *see e.g.,* Note, "Obtaining Testimony Outside the United States: Problem for the California Practitioner", 29 Has-

---

**3.** A letter rogatory is

> [t]he medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country; such request being made, and being usually granted, by reason of the comity existing between nations in ordinary peaceful times.

*The Signe,* 37 F.Supp. 819, 820 (E.D.La.1941).

**4.** Earlier Second Circuit cases apparently took a somewhat different position—particularly where the person from whom disclosure was sought was not a party to the action—suggesting

that as a matter of comity, a court should, if possible, avoid a clash with the law of a foreign country. *See Application of Chase Manhattan Bank,* 297 F.2d 611, 613 (2d Cir.1962); *Ings v. Ferguson,* 282 F.2d 149, 152 (2d Cir.1960); *First National City Bank v. IRS,* 271 F.2d 616, 619 (2d Cir.1959). However, with its decision in *United States v. First National City Bank,* the Second Circuit clearly joined the other federal courts in accepting the view that a prohibition of disclosure under foreign law does not undermine a United States District Court's power to order such disclosure by a party properly before it. *See* discussion in *SEC v. Banca Della Svizzera Italiana, supra,* 92 F.R.D. at 114–16.

tings L.J. 1237, 1243–44 (1978) (hereinafter "Hastings L.J."); Note, "Taking Evidence Outside of the United States", 55 B.U.L. Rev. 368, 373 & n. 37 (1975) (hereinafter "B.U.L.Rev."), and thus were frequently unwilling to compel witnesses within their territory to provide evidence required for litigations in the United States. *See* Hastings L.J. at 1244; B.U.L.Rev. at 374–75. Moreover, those countries typically have different rules governing both the procedures for taking testimony and the applicable privileges, as well as other limitations on requiring testimony, all of which further accentuated the difficulties of obtaining foreign discovery. *See* Hastings L.J. at 1247–48; B.U.L.Rev. at 373 & n. 37. These problems were aptly summarized by Philip W. Amram, an American delegate to the Hague Conference and the rapporteur for the committee that drafted the Convention:

> The taking of testimony abroad has been of interest to American lawyers and the American Bar Association for many years. American lawyers have been frustrated in their efforts to obtain evidence in foreign countries, other than the members of the Anglo-American legal world, because of the marked differences between the common law and civil law concepts and methods of taking evidence. Some countries have insisted on the exclusive use of the complicated, dilatory and expensive system of letters rogatory or letters of request. Other countries have refused adequate judicial assistance because of the absence of a treaty or convention with the United States. The immense increase in international litigation, arising from the change of status of the United States since World Wars I and II, has intensified the need for an effective international agreement to set up a model system that will create a bridge between the common law and civil law systems.

Amram, "The Proposed Convention on the Taking of Evidence Abroad," 55 A.B.A.J. 651 (1969) (footnote omitted).

5. The text of the Convention appears at 28 U.S.

The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444,[5] represented a response by the international legal community to these difficulties. As described by the Report of the United States Delegation to the Hague Conference, the Convention represents an attempt at "bridging over the different concepts of taking evidence in countries which follow the common-law, the civil-law, the Muslim law and other legal systems." United States Department of State, "Report of United States Delegation to Eleventh Session of Hague Conference on Private International Law," 8 Int'l Legal Materials 785, 806 (1969). As noted by the United States delegation:

> [N]o country could be expected to abandon its historic method of taking evidence and its local practice and procedure. What should be asked was that a country agree, in international litigation, to follow as closely as possible the practice and procedure of the requesting State, in order that the evidence might be taken in a manner which most closely approached the technique of the forum where the action was pending. Such agreement would go far to eliminate the waste of time, effort and money which would result if the evidence were taken abroad in a manner that made it inadmissible and useless at the trial of the action.

*Ibid.* To accomplish this, the convention sought to:

> (1) Improve the existing system of letters of request;
>
> (2) Enlarge the devices for the taking of evidence by increasing the powers of consuls and by introducing in the civil law world, on a limited basis, the concept of the commissioner; and
>
> (3) Preserve all more favorable and less restrictive practices arising from internal law, internal rules of procedure, and bilateral or multilateral conventions.

C.A. § 1781 note (Supp.1984).

Amram, *supra,* 55 A.B.A.J. at 652 (footnotes omitted).[6]

The Convention does not, by its terms, prohibit the use of any discovery procedure by any signatory nation. Rather, the Convention describes certain procedures for the taking of evidence in foreign countries and contractually compels each signatory to permit and, if necessary, facilitate the conducting of such proceedings within its jurisdiction, subject only to the right of each signatory to limit its assent in certain specified respects when it signs the Convention. The three procedures described are the use of letters of request (the equivalent of letters rogatory); the taking of evidence by diplomatic or consular officials; and the use of court-appointed commissioners for the same purpose.[7]

With respect to letters of request, the Convention provides as follows:

In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.

\* \* \* \* \* \*

Convention, Ch. I, Art. 1. Each contracting state is required to designate "a Central Authority .... to receive Letters of Request coming from a judicial authority of another Contracting State and to transmit them to the authority competent to execute them." *Id.* at Art. 2.

The Letter of Request may be in English or French unless the executing state—*i.e.,* the State requested to assist—reserves the right to require that the letters be translated into its own language. *Id.* at Art. 4 & Ch. III, Art. 33. The Letter of Request is to identify, *inter alia,* the authority requesting execution, the authority requested to execute it, the names and addresses of the parties to the underlying litigation, the nature of the issues in that litigation, and, "where appropriate," the names and addresses of the persons to be examined, the questions to be asked of them,[8] the documents or other property to be inspected, and any special procedures requested to be followed. *Id.* at Art. 3(a)–(i).

If a Letter of Request does not conform to the requirements of the Convention, the executing state may refuse to execute it, but must inform the requesting state of its objections. Otherwise, the executing state is obliged, with two exceptions, to comply with the Letter of Request:

The execution of a Letter of Request may be refused only to the extent that—

(a) in the State of execution the execution of the Letter does not fall within the functions of the judiciary; or

(b) the State addressed considers that its sovereignty or security would be prejudiced thereby.

Execution may not be refused solely on the ground that under its internal law the State of execution claims exclusive jurisdiction over the subject-matter of

6. The preamble of the Convention reflects these purposes by stating:
   The States signatory to the present Convention,
   Desiring to facilitate the transmission and execution of Letters of Request and to further the accomodation of the different methods which they use for this purpose,
   Desiring to improve mutual judicial co-operation in civil or commercial matters,
   Have resolved to conclude a Convention to this effect and have agreed upon the following provisions—
   28 U.S.C.A. § 1781 note (Supp.1984).

7. Although the use of diplomatic or consular representatives and the use of commissioners are lumped together in Chapter II of the Convention, the report of the United States delegation appropriately treats them as separate methods because of the variations in the procedures applicable to each. United States Delegation Report, *supra,* 8 Int'l Legal Materials at 807. *See Pain v. United Technologies Corp.,* 637 F.2d 775, 788 n. 67 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); *Graco, Inc. v. Kremlin, Inc.,* 101 F.R.D. 503, 508 n. 4 (N.D.Ill.1984).

8. Or, alternatively, "the subject matter about which they are to be examined." *Id.* at Ch. I, Art. 3(f).

the action or that its internal law would not admit a right of action on it.

*Id.* at Art. 12. *See id.* at Arts. 9 & 10.[9]

To bridge the procedural gap between differing legal systems, the Convention provides that ordinarily the executing state "shall apply its own law as to the methods and procedures to be followed" but it also requires that state "to follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties." *Id.* at Art. 9. As for varying laws of evidentiary privilege, the Convention provides that the person giving evidence may assert any "privilege or duty to refuse to give the evidence" either under the law of the executing state or—if specified in the Letter of Request or otherwise confirmed by the requesting state—under the law of the requesting state. *Id.* at Art. 11.[10]

The alternative procedures specified in the Convention are somewhat more limited in scope. With respect to diplomatic and consular officials, the Convention provides that they may take evidence, if voluntarily given, from a national of their own country. The host country, however, may request that permission be sought from it before such evidence is taken. *Id.* at Art. 15. Such diplomatic or consular officials may also take evidence, if voluntarily given, from a national of the host country or another country if the host country permits it. *Id.* at Art. 16.[11]

A commissioner—*i.e.*, an individual appointed for the purpose—may take evidence, if voluntarily given, within the host country, again provided that the host country gives its prior permission. *Id.* at Art. 17.

The consular, diplomatic and commissioner procedures all are designed for the taking of evidence that is voluntarily provided. The host country may, however, permit the diplomatic or consular officials and commissioners to "apply to the competent authority designated by the declaring State for appropriate assistance to obtain the evidence by compulsion." *Id.* at Art. 18.

The diplomatic and consular officials and commissioners may take any type of evidence not "incompatible with the law of the State where the evidence is taken or contrary to any permission granted." *Id.* at Art. 21(a). Moreover, "the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken." *Id.* at Art. 21(d).

Apart from these provisions governing the types of procedures that the contracting states are to provide, the Convention permits the signatory states to limit their assent in specified ways and also ensures that the Convention will not limit or eliminate otherwise available procedures. The reservations that may be made by the signatory states include, *inter alia*, (a) a requirement that Letters of Request be in the language of the executing country rather than in English or French (Art. 4), (b) a declaration that the state will not honor Letters of Request for the inspection of documents (Art. 23) and (c) a declaration that the State will not recognize the procedures for use of diplomatic and consular officials or commissioners (Art. 33). As for the non-exclusive nature of the Convention,

---

**9.** Article 10 provides:

In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings.

Article 9 requires that "[a] Letter of Request shall be executed expeditiously."

**10.** A contracting state may also declare that it will recognize such "privileges and duties" under the laws of other states than the requesting state. *Ibid.*

**11.** The host country may also waive this requirement of prior permission. *Ibid.*

this is established by Article 27, which provides:

> The provisions of the present Convention shall not prevent a Contracting State from—
>
> (a) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
>
> (b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
>
> (c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

## C. Ratification by the United States and the Federal Republic of Germany

The United States ratified the Convention in 1972 without reservation, and furthermore made available compulsory process for the taking of testimony by diplomatic and consular officials and commissioners. *See* 28 U.S.C.A. § 1781 notes at p. 100 (Supp.1984).

The Federal Republic of Germany did not ratify the convention until 1979. At that time it declared, pursuant to Article 23, that it would not honor Letters of Request for the inspection of documents and, pursuant to Article 33, that it would not recognize the use of diplomatic or consular officials to take evidence from a German national. It further required that letters of request be in German or accompanied by a German translation. 28 U.S.C.A. § 1781 notes at pp. 91–92 (Supp.1984).

## D. Analysis

As noted, defendant Lufthansa claims that the Hague Convention requires that

plaintiffs seek compliance with their discovery requests solely through the use of the Convention procedures. This assertion covers all forms of discovery—document production, interrogatories and depositions—and all information requested of Lufthansa, regardless of whether the information may be obtained within the United States or must be sought in the Federal Republic of Germany.

Although the present dispute concerns only plaintiffs' pending request for production of documents from Lufthansa, I will address the use of interrogatories as well since interrogatories are being used in the case.[12]

### 1. Discovery of Information Available to Lufthansa in the United States

█ Lufthansa has not made plain whether some or all of the documents sought by plaintiffs are available in any place other than Germany.[13] It is also uncertain whether any of the interrogatories to be posed by plaintiffs could be answered from evidence available in the United States. In view of these uncertainties and Lufthansa's apparent insistence that even such locally available information must be obtained through the Hague Convention procedures, *see* Lufthansa Memorandum of Law at pp. 4–5, 7, I will first briefly address this contention.

As noted, the principal purpose of the Convention was to alleviate difficulties encountered by litigants in common law countries who were seeking to obtain discovery in civil law countries. *See, e.g.,* Amram, *supra,* 55 A.B.A.J. at 652; United States Delegation Report, *supra,* 8 Int'l Legal Materials at 806–08; Hastings L.J. at 1251;

---

**12.** The other foreign carrier defendants have been providing requested discovery insofar as it is obtainable from their offices in the United States, while formally objecting to the requests to the extent that they are not so limited.

**13.** At a pre-trial conference held on August 6, 1984, counsel for Lufthansa represented that all originals of corporate documents are retained in Germany but that he did not know whether copies of the requested documents—almost all

of which appear to relate to local matters involving the use of Lufthansa's terminal space at the New York area airports—are available in the United States.

In its letter memorandum dated August 8, 1984, Lufthansa appears to state that compliance would require the obtaining of documents from Frankfurt, Germany. *See* Letter of Allen T. Rubeo, Esq. to the Court at p. 2.

B.U.L.Rev. at 380. The focus of concern was that such litigants often needed the cooperation of the foreign government in order to obtain the requested discovery and, in the absence of some binding agreement requiring such assistance, their ability to obtain the information in question would be severely hampered or entirely stymied.

This problem would of course only occur with respect to discovery procedures actually undertaken in the foreign country, and most typically against an individual or entity not subject to the jurisdiction of the American court and therefore not amenable to any form of the American judicial compulsion. Not surprisingly, then, the Convention itself is entitled "Convention on the Taking of Evidence *Abroad* ..." (emphasis added) and is, on its face, addressed solely to the procedures to be used for the gathering of evidence within the borders of countries other than those in which the legal proceeding is pending.

That the Convention was not intended to limit the application of any country's laws with respect to the obtaining of evidence within its geographic jurisdiction is further underscored by the repeated statements found both in the body of the Convention and in the commentaries of its drafters that it was intended to supplement or improve available methods of discovery and not to limit them. The Convention preamble states its purpose as being "to facilitate the transmission and execution of Letters of Request and to further the accomodation of the different methods which [the signatory states] use for this purpose...." Such Letters of Request, both under the Federal Rules of Civil Procedure, and under other and prior authority, have been used to obtain foreign government assistance, where necessary, in the obtaining of information abroad. *See, e.g., Leasco Data Processing Equipment Corp. v. Maxwell,* 63 F.R.D. 94 (S.D.N.Y.1973); *United States v. Paraffin Wax, 2255 Bags,* 23 F.R.D. 289 (E.D.N.Y.1959); *Branyan v. Koninklijke Luchtvaart Maatschappij,* 13 F.R.D. 425 (S.D.N.Y.1953); *De Villeneuve v. Morning Journal Ass'n,* 206 Fed. 70 (S.D.N.Y.1913). No authority has been suggested for the notion that letters of request were ever used or required to be used to enable litigants to obtain information within the very country in which they are litigating.

If resort to letters rogatory for domestic discovery was not necessary before the Convention, it assuredly is not required after its ratification. As noted by Philip Amram, who was the rapporteur for the committee that drafted the Convention, the Convention "makes no major changes in United States procedure and requires no major changes in United States legislation or rules." Amram, *supra,* 55 A.B.A.J. at 655. *See also* the Report of the United States Delegation, noting that "the Convention is a major contribution to the elimination of formal and technical obstacles to securing evidence *abroad*" and that its advantages will "far outweigh the minor adjustments in procedure that may be required." 8 Int'l Legal Materials at 820 (emphasis added).[14]

Had the drafters contemplated a major limitation on the conduct of discovery within a forum court's own geographic jurisdiction, they presumably would have made this plain both in the Convention and in their commentaries. The lack of any such suggestion and the contrary language found in their reports demonstrates the absence of such an intent.

██ The error in Lufthansa's contention to the contrary is evident from its heavy

---

**14.** A similar observation was made by one of the United Kingdom's representatives to the Hague Conference:

> [The Convention] is of interest to the United Kingdom because the taking of evidence *in those countries* which are members of the Conference but with which the United Kingdom has no bilateral Civil Procedure Convention (for example, Japan, the United Arab Republic and Switzerland) will be considerably facilitated in the event that they are able to ratify it.

D.M. Edwards, *Taking of Evidence Abroad in Civil or Commercial Matters,* 18 Int'l and Comp. L.Q. 646 (1969) (emphasis added).

reliance on the notion that imposing American discovery procedures on a German company would offend the sovereign jurisdiction of the Federal Republic of Germany. Whatever pertinence this observation may have with respect to discovery actually conducted on German territory, *see, e.g., Volkwagenwerk Aktiengesellschaft v. Superior Court,* 123 Cal.App.3d, 840, 847–48, 176 Cal.Rptr. 874, 878 (1981) (refusing to order, *inter alia,* inspection of defendant's factory and internal interviews with employees in Germany), it plainly has none with respect to discovery conducted here. Foreign-based companies that choose to conduct business within the United States are of course amenable to the jurisdiction of American courts and are simply not clothed with the immunity of the foreign government under whose laws they may have been organized. *See, e.g., United States v. First National City Bank,* 396 F.2d 897, 900–01 (2d Cir.1968); *Graco, Inc. v. Kremlin, Inc.,* 101 F.R.D. 503, 521 (E.D. Pa.1984); *cf. Societe Internationale v. Rogers, supra,* 357 U.S. at 211–12, 78 S.Ct. at 1095–96.[15] Indeed, even the cases principally relied upon by Lufthansa—*Volkswagenwerk Aktiengesellschaft v. Superior Court,* 123 Cal.App.3d 840, 176 Cal.Rptr. 874 (1981), and *Pierburg GmbH & Co. KG v. Superior Court,* 137 Cal.App.3d 238, 186 Cal.Rptr. 876 (1982)—explicitly recognize that American courts have the jurisdiction to require foreign parties to comply with the rules of discovery of the forum state. *Volkswagenwerk Aktiengesellschaft, supra,* 123 Cal.App.3d at 856–57, 176 Cal. Rptr. at 883–84; *Pierburg GmbH & Co. KG, supra,* 137 Cal.App.3d at 241, 186 Cal. Rptr. at 878.

In sum, the Hague Convention does not apply at all to the discovery of evidence available in the United States. *See, e.g., Graco, Inc. v. Kremlin, Inc., supra,* 101

F.R.D. at 520–24; *General Elect. Co. v. North Star Int'l, Inc.,* No. 83 C 0838, slip op. at 6–8 (N.D.Ill. Feb. 21, 1984); *Renfield Corp. v. E. Remy Martin & Co., S.A.,* 98 F.R.D. 442, 444 (D.Del.1982); *Lasky v. Continental Products Corp.,* 569 F.Supp. 1227, 1228–29 (E.D.Pa.1983); *Hodson v. A.H. Robins Co.,* 528 F.Supp. 809, 820 (E.D.Va.1981), *aff'd,* 715 F.2d 142 (4th Cir. 1983). *Contra, Schroeder v. Lufthansa German Airlines,* 18 Av.Cas. (CCH) 17,-222, 17,223–24 (N.D.Ill.1983); *Pierburg GmbH & Co. KG v. Superior Court, supra,* 137 Cal.App.3d 238, 186 Cal.Rptr. at 881.

## 2. *The Obtaining of Evidence Available to Lufthansa in Germany*

The assertion by Lufthansa that the Federal Rules are inapplicable to discovery of information that it may have in Germany is premised upon two alternative theories—(1) that the Hague Convention is intended to provide the exclusive procedures for such discovery even from a party to a United States lawsuit, and, as governing federal law, has overruled any prior inconsistent federal or state law or rules; or (2) that the Convention embodies a respect for the judicial sovereignty of foreign states, which should be honored by United States courts as a matter of comity by requiring that parties to American litigation follow the Convention procedures for all discovery seeking information located in a foreign signatory country. *See, e.g.,* Lufthansa's Memorandum of Law at pp. 4–5 (quoting *Volkswagenwerk Aktiengesellschaft v. Superior Court,* 33 Cal.App.3d 503, 109 Cal. Rptr. 219, 221, (1973)). An evaluation of these theories requires a brief reference to the state of the law preceding ratification of the Hague Convention.

---

**15.** Even foreign governments may be sued in American courts for actions undertaken in their commercial capacity in the United States, *see generally* 28 U.S.C.A. §§ 1330, 1602 *et. seq.; Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 1968–69, 76 L.Ed.2d 81 (1983); *Ministry of Supply, Cairo v. Universe Tankship, Inc.,* 708 F.2d 80, 84 (2d Cir.1983);

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 307–15 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), and, if amenable to United States substantive law, are presumably also subject in those proceedings to American procedural law.

■ As previously noted, the federal courts have repeatedly acknowledged their own authority to compel a party to provide relevant discovery pursuant to the normal procedures outlined in the federal rules, both civil and criminal, regardless of where the information is actually located. *See e.g., Societe Internationale v. Rogers, supra,* 357 U.S. at 204–06, 78 S.Ct. at 1091–92; *United States v. First Nat'l City Bank, supra,* 396 F.2d at 900–01; *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1144–45 (N.D.Ill.1979); *Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 521; *In re Grand Jury 81-2,* 550 F.Supp. 24, 27, 29 (W.D.Mich.1982); *In re Grand Jury Subpoenas Duces Tecum Addressed to Canadian Int'l Paper Co.,* 72 F.Supp. 1013 (S.D.N.Y.1947). The authority of American courts to order discovery of information in the control of a party over whom the court has jurisdiction is so compelling as to override even an explicit prohibition of disclosure by the law of the country in which the information is located. *See, e.g., Societe Internationale v. Rogers, supra,* 357 U.S. at 205, 78 S.Ct. at 1092; *In re Grand Jury Proceedings, supra,* at pp. 831–833; *Arthur Andersen & Co. v. Finesilver, supra,* 546 F.2d at 341–42; *United States v. First Nat'l City Bank,* 396 F.2d at 900–01; *SEC v. Banca Della Svizerra Italiano, supra,* 92 F.R.D. at 114–17; *In re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1145–49; *American Industrial Contracting, Inc. v. Johns-Manville Corp., supra,* 326 F.Supp. at 880; *Restatement (Second) of the Foreign Relations Law of the United States* §§ 39–40 (1965). *See also In re Westinghouse Elect. Corp. Uranium Contracts Litigation, supra,* 563 F.2d at 996–99 (majority opinion); *id.* at 1002 (Doyle, J., dissenting).[16]

■ In view of these well established principles, plaintiffs' first theory—that as a

matter of law the Hague Convention compels the use of its procedures for discovery against a foreign litigant in a United States court—implicitly assumes that the Convention was intended to override this pre-existing body of law. For a number of reasons this view is untenable and, indeed, has not been accepted even in the cases cited by Lufthansa.

First, as already noted, the Convention was drafted to expand and liberalize the previously available avenues for discovery, not to constrict them or limit the jurisdiction of the courts of the signatory states. Its stated purpose was to facilitate the use of letters of request by ensuring that foreign states would honor them in specified circumstances and that they would be executed in a manner compatible with the requirements of the legal system in which the underlying litigation was pending. *See, e.g.,* B.U.L.Rev. at 380–84; Hastings L.J. at 1251–54; Amram, *supra,* 55 A.B. A.J. at 652–54; Report of U.S. Delegation, *supra,* 8 Int'l Legal Materials at 807–15. The problem of the enforceability of letters rogatory was typically encountered when a litigant in the United States attempted to obtain discovery from a source of information beyond the jurisdiction of the United States court and then required the assistance of a foreign judicial system to obtain this information. B.U.L.Rev. at 373 n. 35 (noting the Federal Republic of Germany and the Netherlands as two countries that will not compel a witness's testimony in response to a letter rogatory in the absence of a treaty). This was not a problem when the discovery was sought from another litigant since the jurisdiction of the United States court ensured that the litigant could be compelled to produce the information or suffer sanctions under the federal rules. *See, e.g., Arthur Andersen & Co. v. Finesilver, supra,* 546 F.2d at 342.[17]

---

**16.** If the foreign law has in fact prevented the litigant from providing the information despite a United States court order, the good faith of the discovered party is relevant to the sanctions that may be imposed for noncompliance with the court order, *see, e.g., Societe Internationale v. Rogers, supra,* 357 U.S. at 205–06, 209–13, 78 S.Ct. 1092–93, 1094–1096; *In re Westinghouse Elect. Corp. Uranium Contracts Litigation, supra,* 563 F.2d at 996–99, but this does not detract from the authority of the court to order such discovery to take place.

**17.** As one court recently concluded: .

Second, in confirmation of the limited scope and affirmative purpose of the Convention, its language is in general permissive rather than mandatory, and contains no prohibition on the exercise of jurisdiction by any court. Indeed, the only mandatory language in the Convention is found in those provisions compelling the signatory states to honor Letters of Request in certain specified circumstances. It may fairly be presumed that if the purpose or anticipated effect of this document was to deprive the United States courts of their hitherto unquestioned authority to apply the federal discovery rules to litigants regardless of where the information was located, it would have so specified.[18]

Third, the limited scope and affirmative purpose of the Convention is further confirmed by the above-cited commentaries of the Convention drafters, all of which emphasize that the Convention was intended to expand discovery opportunities and that it would require no significant change in American rules and procedures. *See, e.g.,* Amram, *supra,* 55 A.B.A.J. at 652, 655; U.S. Delegation Report, *supra,* 8 Int'l Legal Materials at 806–08, 820. This emphasis on the purely liberalizing effect of the Convention, which is entirely consistent with the language of the agreement, is entirely inconsistent with the notion urged by Lufthansa, that the Convention effectively superceded the federal rules of procedure. *See, e.g., Compagnie Francaise*

> [I]t is a mistake, the court believes, to view the Convention as an international agreement to protect foreign nationals from American discovery when they are parties properly before American courts.
>
> *Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 519–20.

**18.** The extent of the invasion of American judicial sovereignty that Lufthansa's approach would entail was well stated in *Graco, Inc. v. Kremlin, Inc., supra:*

> The solicitude for the judicial sovereignty of civil law countries shown in *Schroeder, Philadelphia Gear* and *Pierburg* apparently is unmatched by any recognition that they are suggesting a startling limitation on the sovereign powers of this country, as expressed through its courts. Treating the Convention procedures as exclusive would make foreign authorities the final arbiters of what evidence

*D'Assurance Pour Le Commerce Exterieure v. Philips Petroleum Co.,* 81 Civ. 4463 (CLB) Memorandum and Order at 11–12 (S.D.N.Y. Jan. 25, 1983). *Cf. In re Grand Jury Proceedings,* at 830–31 (discussing effect of the Single Convention on Narcotic Drugs, March 30, 1961, 18 U.S.T. 1409, T.I.A.S. 6298, on powers of grand jury).

The unlikelihood of such an unstated intention is underscored by the nature of the discovery request that Lufthansa's motion seeks to prohibit in this case. The discovery presently at issue is a Rule 34 request for production of documents. In ratifying the Convention, however, the Federal Republic of Germany explicitly declined, pursuant to Article 23, to honor letters of request for the inspection of documents. 28 U.S.C.A. § 1781 (Supp.1984) n. 5 at p. 92. *See* Shermanski, "Obtaining Evidence in the Federal Republic of Germany: The Impact of the Hague Convention on German-American Judicial Cooperation", 17 Int'l Lawyer 465, 480–85 (1983). Necessarily, then, if the Convention were deemed to supplant the Federal Rules as the governing law on discovery from a litigant, in this case it would entirely deprive plaintiffs of a major tool of discovery against Lufthansa. The unfairness of such a result is compounded by the fact that, as a litigant, Lufthansa would still be able to avail itself of the Rule 34 procedures against plaintiffs.[19]

> may be taken from their nationals, even when those nationals are parties properly within the jurisdiction of an American court. This cession of jurisdiction not only would apply at the discovery stage, presumably, but also determine what evidence may be taken from their nationals at trial or for use at trial.
>
> 101 F.R.D. at 522.

**19.** Lufthansa has not suggested that the Federal Republic of Germany would honor an American litigant's document request in spite of its explicit reservation to the contrary. Although at least one American court has speculated that Germany might do so as a matter of good faith under Article 9 of the Convention, *see Philadelphia Gear Corp. v. American Pfauter Corp.,* 100 F.R.D. 58, 60–61 (E.D.Pa.1983), a more detailed analysis of German law and practices suggests otherwise except in limited circumstances not

In short, neither the language of the Convention, nor its stated purpose, nor the subsequent commentaries of its drafters nor common sense supports the first of Lufthansa's theories for application of the Convention to bar discovery of information located in Germany. Moreover, the principal policy consideration invoked by the cases Lufthansa cites—respect for the sovereignty of the foreign signatories—would not be put at risk by permitting discovery of the sort requested by plaintiffs in this case.

As one court recently noted: "A nation's judicial sovereignty is only threatened ... when discovery would take place within its borders." *General Elect. Co. v. North Star Int'l, Inc., supra,* slip op. at 7. In this case plaintiff seeks production of documents by Lufthansa in New York City. Such production would not take place in the Federal Republic of Germany and thus—in contrast, for example, to the conducting of a deposition or an inspection in Germany— could not reasonably be deemed to invade that country's judicial sovereignty.[20] Similarly, the service in this country of answers to interrogatories, even if based in whole or in part on information obtained by the litigant from its overseas offices, does not appear to offend seriously any notion of judicial independence on the part of the nation from which the information was obtained.[21] *See, e.g., Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 520–21. This is underscored by the well settled line of cases, previously cited at pp. 438–439, 445, *supra,* holding that even an explicit foreign statutory bar on disclosure is not a basis for shielding a litigant in a United States court from its obligations under the federal rules governing discovery.

As one court recently observed in this respect:

It is fair to assume that the availability of the Convention procedures was intended to discourage, and possibly to preempt, the taking of evidence within a signatory state's borders without securing local judicial approval or cooperation, whether the evidence is to be taken from a party or a non-party witness. Such an intent would be a manifestation of for-

present here. *See Shermanski, supra,* 17 Int'l Lawyer at 480–85. *Accord, Murphy v. Reifenhauser KG Maschinenfabrik,* 101 F.R.D. 360, 361 (D.Vt.1984). This skepticism is especially warranted since the Court in *Philadelphia Gear* clearly misconstrues Article 9. That provision requires the executing state to "follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance." This article is designed to assure that testimony is taken in a manner compatible with the requirements of the legal system of the requesting state. *See, e.g.,* U.S. Delegation Report, *supra,* 8 Int'l Legal Materials at 810–11. It is thus a procedural provision to help bridge the gap between civil and common law systems. It is not reasonable to construe it as a general substantive requirement that overrides the more specific limitations of Article 23, which permits a signatory government to decline to honor document requests. Indeed to read it as *Philadelphia Gear* does would effectively read Article 23 out of the Convention and endow a general provision with controlling authority over a more specific provision. This would be inconsistent with elementary principles of statutory and treaty construction, *see generally United States v. Menasche,* 348 U.S. 528, 538–39, 75

S.Ct. 513, 519–520 (1955); 2A D. Sands, *Sutherland Statutory Interpretation* § 46.06 (Rev.3d ed. 1973), and is unsupported by the legislative history of the Convention.

**20.** The Federal Republic of Germany may or may not have a statutory or other policy against disclosure of the type of information sought by plaintiffs—regardless of where the disclosure takes place—but no such policy has been suggested by Lufthansa. *Compare, e.g., Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 508–09, 513, (French blocking statute prohibits disclosure of commercial information sought by plaintiff's interrogatories). Moreover, even if such a policy existed, disclosure in the United States would not impinge on Germany's judicial sovereignty, which involves the responsibility for judicial and litigative proceedings in Germany.

**21.** The propriety, under the Hague Convention, of a New York State court order directing a French litigant to answer interrogatories has been appealed to the United States Supreme Court in *Club Mediteranee, S.A. v. Dorin,* 52 U.S.L.W. 3210 (U.S. Sept. 16, 1983). The Court has not yet noted probable jurisdiction and is awaiting an *amicus* brief by the United States on the issue.

eign displeasure with American discovery practices, which may occasionally have included depositions abroad without approval from local authorities. It should be emphasized, though, that the text of the Convention carries no explicit prohibition of alternative methods of taking evidence. In fact, alternative methods ostensibly are preserved by Article 27, which states:

> The provision of the present Convention shall not prevent a Contracting State from—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.

Whether the Convention was intended to limit intrusive unauthorized discovery proceedings by prohibiting them, or merely by offering an attractive alternative, the court cannot agree that the Convention was intended to protect foreign parties, over whom an American court properly has jurisdiction, from the normal range of pre-trial discovery available under the Federal Rules of Civil Procedure. Nor does the court agree that the Convention requires deference to a country's judicial sovereignty over documents, people, and information—if this really is how judicial sovereignty is to be understood—when they are to be produced in this country. ...In this court's view, the critical question is where the evidence-taking proceeding is to be conducted.... This court believes that discovery does not take place within [a state's] borders merely because documents to be produced somewhere else are located there. Similarly, discovery should be considered as taking place here, not in another country, when interrogatories are served here, even if the necessary information is located in the other country.

*Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 520–21.

In short, the Convention does not bar the enforcement of Rules 33 and 34 of the Federal Rules of Civil Procedure against Lufthansa regardless of where the requested information or documents are located. *See* Struve, "Discovery from Foreign Parties in Civil Cases Before U.S. Courts," 16 N.Y.U.J. Int'l L. & Pol. 1101, 1109–13 (1984).

Lufthansa's alternative theory is that, as a matter of international comity, the Court should require plaintiffs to follow the discovery procedures specified in the Convention. As articulated by *Volkswagenwerk Aktiengesellschaft v. Superior Court, supra,* 123 Cal.App.3d at 857, 176 Cal.Rptr. at 884—the case upon which Lufthansa principally relies—comity suggests a discretionary act of self-restraint in deference to the notion that:

> the courts of one sovereign state should not, as a matter of sound international relations, require acts or forebearances within the territory, and inconsistent with the internal laws, of another sovereign state unless a careful weighing of competing interests and alternative means makes clear that the order is justified. Rulings based on this concept of international comity are dictated not by technical principles of jurisdiction of the parties to or subject-matter of particular lawsuits, but rather by exercise of judicial self-restraint in furtherance of policy considerations which transcend individual lawsuits. (Cf. Rest.2d Foreign Relations Law of the United States, §§ 39–40.) Particularized to discovery matters it is "a policy of avoiding international discovery methods productive of friction with the procedures of host nations."

Based upon such a weighing process, a number of courts have concluded that the avoidance of unnecessary conflict with foreign legal systems counsels in favor of at least an initial resort to the Hague Convention procedures. *See id.* at 858–59, 176 Cal.Rptr. at 885; *Pierburg GmbH & Co. KG v. Superior Court, supra,* 137 Cal. App.3d at 244–47, 186 Cal.Rptr. at 880–83; *Schroeder v. Lufthansa German Airlines, supra,* 18 Av.Cas. (CCH) at 17,223–24; *General Elect. Co. v. North Star Int'l,*

*Inc., supra,* slip op. at 4–5; *Philadelphia Gear Corp. v. American Pfauter Corp., supra,* 100 F.R.D. at 60–61. Apparently, these courts contemplate that if the discovering party cannot obtain the sought-after information through Convention channels, it may request leave to use the ordinary procedures available under the Federal Rules. *E.g., Philadelphia Gear Corp. v. American Pfauter Corp., supra,* 100 F.R.D. at 61.

Implicit in this approach is the assumption that the Hague Convention and Federal Rules are at least in partial conflict. For the reasons already stated, it is questionable whether this is in fact the case. The Convention appears to have been designed to ease inter-system conflicts by making available several methods of discovery that either had not been previously available or had not been previously guaranteed recognition and assistance by the signatory states. As such, it is designed as a broadening rather than a limiting vehicle for discovery, and accordingly it contains neither an explicit nor an implicit prohibition on the use by signatory states of their own internal rules and procedures if they are deemed effective. *See, e.g.,* pp. 439–440, 443, 445–446, *supra.* That being the case, the existence of the Convention can scarcely be deemed to create a conflict that had not previously existed, and hence it would not provide a basis under any circumstances for withdrawing from a United States litigant the procedures ordinarily available under the federal rules.[22] *Cf. Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 523–24 (suggesting that conflict would be exacerbated by requiring participation of foreign authorities in all discovery of foreign parties).

Even assuming *arguendo,* however, that a balancing analysis of the type suggested by these decisions were appropriate, in the present case principles of comity do not support the conclusion that plaintiffs should be compelled to use the Hague Convention procedures with respect to document and interrogatory discovery addressed to Lufthansa.

As already suggested, "comity is largely a function of relative interests as between overlapping jurisdictions." *Murphy v. Reifenhauser KG Maschinenfabrik, supra,* 101 F.R.D. at 363 (citing *Hilton v. Guyot,* 159 U.S. 113, 164–65, 16 S.Ct. 139, 143–44, 40 L.Ed. 95 (1895)). In evaluating the relative interests of the Federal Republic of Germany and of the United States, it is apparent that the predominant interests strongly favor the use of the Federal Rules.

The interests of the German government in requiring plaintiffs to follow the Hague Convention procedures are simply not very compelling. First, as previously suggested, the acts required of Lufthansa to produce documents here or to answer interrogatories here do not touch upon any reasonable notion of German judicial sovereignty. The German courts presumably have an interest in how judicial and court-related proceedings—such as depositions—are conducted in Germany, but they surely do not have such an interest in proceedings conducted in the United States. Second, Lufthansa does not claim that disclosure of the information sought would violate any substantive German policy—statutory or otherwise—against the disclosure of such information.[23] Moreover, as noted, even if there were such a policy, the United States courts have repeatedly rejected such a statutory or other bar as a basis for declining

**22.** It bears emphasis in this regard that, prior to the ratification of the Hague Convention, the federal courts routinely enforced the federal rules of discovery against litigants even when this required the production of evidence from abroad, and never suggested that this improperly invaded the judicial sovereignty of foreign states. The ratification of the Hague Convention has not altered this principle, as the post-ratification cases upholding such decisions

plainly reflect. *See, e.g.,* cases cited at p. 438, *supra.*

**23.** The documents presently at issue concern such matters as crowd flow in Lufthansa's New York area terminals, and information that the airline may have collected concerning plaintiffs' activities.

to order a litigant to provide such discovery. *See* cases cited at p. 438, *supra.*

In contrast, the reasons for permitting plaintiffs to pursue their discovery against Lufthansa under Fed.R.Civ.P. 33 and 34 are quite compelling.

First, plaintiffs assert claims in this case arising under the First Amendment. Whatever may be the ultimate merits of their claims, the paramount importance of those rights militates against imposing any greater limitations on discovery than are found in the Federal Rules themselves. *Cf. In re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1154; *Graco, Inc. v. Kremlin, Inc., supra,* 101 F.R.D. at 512.

Second; at least with respect to the plaintiffs' request for documents, a requirement that plaintiffs seek the cooperation of the German government is likely to be an act of futility since the Federal Republic of Germany has specifically declared pursuant to Article 23 of the Convention that it will not execute Letters of Request issued to obtain pre-trial discovery of documents. *See, e.g., Murphy v. Reifenhauser KG Maschinenfabrik, supra,* 101 F.R.D. at 361, 363.

Third, as a number of courts have observed, the Hague Convention machinery is quite slow and costly even when the foreign government agrees to cooperate. *See, e.g., Pain v. United Technologies Corp., supra,* 637 F.2d at 788–89; *Murphy v. Reifenhauser KG Maschinenfabrik, supra,* 101 F.R.D. at 361. The significance of this consideration is enhanced by the pendency of this litigation for nine years, a delay that led the United States Court of Appeals to issue an explicit directive to the District Court to expedite the resolution of the case. 727 F.2d at 257 n. 2. *See, e.g., Murphy v. Reifenhauser KG Maschinenfabrik, supra,* 101 F.R.D. at 363. The important First Amendment issues at stake here should not be further delayed except for the most compelling of reasons and no such reasons have been suggested. As the Court in *Murphy* concluded: "[T]his case should not be further prolonged for many months in order to accommodate a somewhat hypothetical conflict between ordinary American discovery and German sovereignty." *Ibid.*

## CONCLUSION

For the reasons stated, the motion of defendant Lufthansa German Airlines for a protective order with respect to plaintiff's notice for production of documents is denied, and defendant shall comply with plaintiffs' document request within two weeks from the date of this Opinion and Order. Discovery in this case addressed to the parties under Rules 33 and 34 shall proceed in accordance with the terms of those rules.